JUDGE DAVID GUADERRAMA

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

FILED

2022 NOV -4  PM 2: 14

CLERK. U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
        DEPUTY

|  |  |
|---|---|
| **ERIK SALAIZ,** §<br>§<br>**Plaintiff,** §<br>§<br>**v.** §<br>§<br>**DEBT USA LLC,** a Delaware Corporation, §<br>**CORDOBA LEGAL GROUP LLC,** a Florida §<br>Limited Liability Company, **KISCH LAW FIRM,** §<br>**PLLC,** a Texas Professional Limited Liability §<br>Company, and **DEBT PAY GATEWAY, INC.,** §<br>a California Corporation §<br>**Defendants.** §<br>§ | EP22CV0409 |

## PLAINTIFF'S ORIGINAL COMPLAINT

## PARTIES

1.      Plaintiff ERIK SALAIZ is a natural person and is a citizen of the Western District of

Texas and was present in the Western District of Texas during all calls at issue in this case.

2.      Defendant DEBT USA LLC ("USA") is a corporation existing under the laws of

Delaware with its principal address at 102 NE 2nd Street #237, Boca Raton, Florida, 33432 and

can be served via registered agent Daniel Meeler at 102 NE 2nd Street #237, Boca Raton, Florida,

33432.

3.      Defendant CORDOBA LEGAL GROUP, LLC ("Cordoba") is a limited liability company

organized and existing under the laws of Florida with a principal address of 102 NE 2nd Street,

STE 252, Boca Raton, Florida 33432 and can be served via registered agent Alfredo Cordoba at

102 NE 2nd Street, STE 252, Boca Raton, Florida 33432.

4.   Defendant KISCH LAW FIRM, PLLC ("Kisch") is a professional limited liability company

1

organized and existing under the laws of Texas with a principal address of 6915 Kelsey Rae

Court, STE 100, Houston, Texas 77069 and can be served via registered agent Karen Kisch at

6915 Kelsey Rae Court, STE 100, Houston, Texas 77069.

5.      Defendant DEBT PAY GATEWAY, INC ("Gateway") is a corporation organized and

existing under the laws of California with a principal address of 1900 E Golf Road, STE 550.

Shaumburg, Illinois 60173 and can be served via registered agent Kristopher Kehler at 1900 E

Golf Road, STE 550. Shaumburg, Illinois 60173.

6.   Defendants USA, Cordoba, Kisch, and Gateway are hereinafter referred to collectively as

("Defendants").

## NATURE OF ACTION

7.      As the Supreme Court recently explained, "Americans passionately disagree about many

things. But they are largely united in their disdain for robocalls. The Federal Government receives

a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. . . . For

nearly 30 years, the people's representatives in Congress have been fighting back." *Barr v. Am.

Ass'n of Pol. Consultants LLC*, 140 S. Ct. 2335, 2343 (2020).

8.      Plaintiff Erik Salaiz ("Plaintiff") brings this action under the Telephone Consumer

Protection Act ("TCPA"), 47 U.S.C. § 227, alleging that Defendants telemarketers/agents placed

illegal unauthorized telemarketing phone calls to him in violation of the TCPA.

9.      As part of marketing their services, Defendants hired and authorized telemarketers to

place illegal unauthorized phone calls to Plaintiff's cell phone that used an automatic telephone

dialing system ("ATDS").

10.      Plaintiff never consented to receive any of these phone calls, which were placed to him

for telemarketing purposes.

**JURISDICTION AND VENUE:**

11.     This Court has federal subject matter jurisdiction under 28 U.S.C. § 1331, as this case

arises under the Telephone Consumer Protection Act, 47 U.S.C. § 227, which is a federal statute.

12.     This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising

under Texas Business and Commerce Code 305.053 because that claim arises from the same

nucleus of operative fact, i.e., Defendants' telemarketing calls to Plaintiff, and adds little

complexity to the case, so it is unlikely to predominate over the TCPA claims.

13.     This Court has personal jurisdiction over Defendants because they conduct business in

this District and in the State of Texas and because the events giving rise to this lawsuit occurred

in this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants

regularly conduct business in the State of Texas and in this District, and because the wrongful

conduct giving rise to this case occurred in this District.

**THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C. § 227**

15.     In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing

equipment that could target millions of consumers *en masse*.  Congress found that these calls

were not only a nuisance and an invasion of privacy to consumers specifically but were also a

threat to interstate commerce generally.  *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in

1991 U.S.C.C.A.N. 1968, 1969-71.

16.     The TCPA makes it unlawful "to make any call (other than a call made for emergency

purposes or made with the prior express consent of the called party) using an automatic

telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

17.     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

18.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

19.     Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

20.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

21.     According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

22.     The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

23.     The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any goods or service.

24.      *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

25.      The FCC confirmed this principle in 2013, when it explained that "a seller …may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." In the Matter of the Joint Petition Filed by Dish Network LLC, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

26.      Under the TCPA, a text message is a call. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016).

## FACTUAL ALLEGATIONS:

27.      Plaintiff's personal cell phone (XXX) XXX-1527 has been registered on the National Do-Not-Call Registry since March 6, 2022.

28.     Plaintiff never asked the National Do-Not-Call Registry administrator to remove him

from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry

at all times relevant to this Complaint.

29.     Defendant USA offers debt relief services to consumers.

30.     Defendant USA generates and qualifies new clients for all Defendants through illegal

telemarketing calls that violate the TCPA.

31.     Defendant Cordoba is an organization owned and controlled by Alfredo Cordoba.

32.     Alfredo Cordoba is a licensed attorney in the state of Florida and uses Defendant

Cordoba in an attempt to make telephone solicitations for his legal services.  These solicitations

violate the TCPA, National Bar Association, and Florida State Bar Association prohibitions

against solicitations.

33.      Defendant Kisch is a law firm owned and controlled by Karen Kisch.

34.     Defendant Kisch uses third party telemarketers to solicit their legal services through

unauthorized telemarketing calls that violate the TCPA, National Bar Association code of ethics,

and Texas State Bar Association code of ethics.

35.     Defendant Kisch is aware of the TCPA, National Bar Association, and Texas State Bar

Association prohibitions against solicitation but knowingly violates these prohibitions for

economic gain.

36.     Defendant Gateway is a company that knowingly processes payments from companies

that solicit in violation of the TCPA.  Defendant Gateway also knowingly and willfully processes

payments in advance of services rendered, or debts are forgiven.  This is an unlawful payment

processing scheme that collects payments in advance of services rendered in violation of the

TSR.  16 C.F.R. § 310.2(cc) and 16 C.F.R. § 310.4(a)(5)(i).

37.     Gateway, through its sister company, Debt Pay Pro, which has common ownership and integration, facilitate lead generation, phone calls, and payment processing all through their proprietary software.

38.     Defendant Gateway, in coordination with its sister company, Debt Pay Pro is a one-stop shop for all things debt related.

39.     Defendant Gateway and its sister company Debt Pay Pro have provided the ability of debt elimination solicitation companies to "Push leads direct into your dialer service and receive updates in your CRM when calls are dispositioned." – Dialer Integration.

https://www.debtpaypro.com/debt-settlement-crm-software/

40.     As part of their marketing, Defendants USA, Cordoba, and Kisch hire and authorizes telemarketers to make unauthorized phone calls to thousands of consumers *en masse* using an automatic telephone dialing system ("ATDS") to solicit their "debt relief" services.

41.     Defendants USA, Cordoba, and Kisch approve of the contracts with these telemarketers.

42.     Defendants USA, Cordoba, and Kisch authorize the payments to the telemarketers.

43.     Defendants USA, Cordoba, and Kisch pay the telemarketers out of bank accounts they owns and control.

44.     Defendants USA, Cordoba, and Kisch are well aware that the unauthorized phone calls being made on their behalf soliciting their "debt relief" services violate the TCPA.

45.     Defendants USA, Cordoba, and Kisch knowingly and willfully violate the TCPA because doing so benefits them financially when consumers enroll into their "debt relief" services.

46.     Defendant Gateway is well aware Defendants USA, Cordoba, and Kisch engage in illegal telemarketing, however, continue to process payments from client's sent by Defendants USA, Cordoba, and Kisch because doing so benefits Defendant Gateway financially.

47.     Plaintiff received at least twelve (12) unauthorized phone calls to his personal cell phone (XXX) XXX-1527 from telemarketers calling on behalf of Defendants USA, Cordoba, and Kisch soliciting their "debt relief" services program within a thirty-day period ("the calls").

48.     The calls all started with a 3-4 second delay of dead air followed by an audible beep (indicating the calls were made using an ATDS) before connecting Plaintiff to a telemarketer.

49.     The calls were generated using an ATDS that has the capacity to  produce telephone numbers to be called, using a random or sequential number generator.

50.     Plaintiff has never had any relationship with any of the Defendants and never knew who Defendants were prior to the calls being made to his personal cell phone.

51.     Upon information and belief Plaintiff has received additional calls within the past two years from or on behalf of Defendants that are unknown to Plaintiff at this time and will be revealed during discovery.

52.     Defendants Cordoba, Kisch, and Gateway have been sued in the same lawsuit for violating the TCPA *Gonzalez v. Kisch Law Firm, PLLC et al*, No. 3:22-cv-00280-DCG (W.D.TX., Aug. 15, 2022).

53.     Defendant Gateway has been sued in multiple other lawsuits for violating the TCPA *Cunningham v. Peak Legal Advocates et al*, No. 3:15-cv-00224 (M.D.TN., Mar. 06, 2015), and *Cunningham v. AAA Law Group, LLC et al,* No. 4:19-cv-00105-ALM-CAN (E.D.TX., Feb. 08, 2019).

54.     Defendant USA has been sued for violating the TCPA *Graham v. Debt USA LLC,* No. 1:22-cv-00383-RP (W.D.TX., Apr. 22, 2022).

55.     Defendants all continue their illegal behavior because violating the TCPA benefits them financially.

56.     Defendants USA, Cordoba, and Kisch's telemarketers called and harassed Plaintiff soliciting debt relief services at least eleven times before Plaintiff was able to identify the Defendants true identity.

57.     On September 20, 2022, Plaintiff received one of multiple calls from a telemarketer calling on behalf of Defendants from phone number (915) 929-7505.

58.     Plaintiff answered and there was a 3-4 second delay of dead air followed by an audible beep (indicating the call was made using an ATDS) before being connected to a female telemarketer.

59.     The female telemarketer falsely identified herself and advised Plaintiff she was calling from "united credit services" and that her company is a debt relief financial company.

60.     Defendants instruct their telemarketers to say their calling from "united credit services" in order to hide their true identity and duck liability for violating the TCPA.

61.     The female telemarketer stated to Plaintiff,

"we are offering you a hardship program where we can negotiate down your debts on your interest rates with your creditors"

62.     Plaintiff was extremely annoyed and aggravated for continuing to receive calls from telemarketers from "united credit services" soliciting debt relief services and advised the female telemarketer he was interested in the "hardship program" for the sole purpose of identifying the companies responsible for the calls.

63.     The female telemarketer collected Plaintiff's personal debt and solicited Plaintiff for a "hardship program" on behalf of Defendants.

64.     The female telemarketer then transferred Plaintiff to her "senior advisor" named Gary.

65.     Before transferring the call, the female telemarketer stated to Gary, "Gary please take over".

66.     Gary accepted the call from the female telemarketer confirming that Defendants hire and authorize telemarketers to make unauthorized phone calls to consumers soliciting debt relief services on behalf of Defendants.

67.     Gary confirmed Plaintiff's personal debts and solicited Plaintiff for a "debt relief" program on behalf of Defendants.

68.     Gary falsely identified the company he was from and advised Plaintiff he was from "Self Debt".

69.     Defendants instruct their telemarketers to say their calling from "Self Debt" in order to hide their true identity and duck liability for violating the TCPA.

70.     Gary advised Plaintiff that he was going to pull Plaintiff's credit report in order to confirm Plaintiff's personal debt and advised Plaintiff which of their debt relief programs would be best for Plaintiff.

71.     Plaintiff received an email from Gary from Gary.williams@theenrollment.com with a copy of Plaintiff's credit report. *See Exhibit A.*

72.     The credit report Plaintiff received from Gary shows Defendant USA is the company that requested Plaintiff's credit report and revealed one of the companies responsible for the calls. See *Exhibit A.*

73.     Gary went over Plaintiff's personal debt and advised Plaintiff that Plaintiff will be paying $303/mnth for 34 months for the debt relief program.

74.     If Plaintiff would have enrolled into the debt relief program from Defendants, it would benefit all Defendants financially.

75.     Plaintiff then received a text message from Gary from phone number 561-425-7815 with Defendant Cordoba's website they own and control https://www.cordobalegal.com. Gary advised Plaintiff this was his company's website.

76.     The text message Plaintiff received from Gary confirmed another one of the companies responsible for the calls. *See Exhibit B.*

77.     Gary advised Plaintiff he no longer has to be making payments to his creditors only the $303/mnth to Defendants.

78.     Gary advised Plaintiff if his creditors ever call him, to tell them he is working with Cordoba Legal Group and to have them call phone number (561)-560-3196.

79.     Gary advised Plaintiff that the Defendants will be negotiating Plaintiff's debt with his creditors on behalf of Plaintiff.

80.     Plaintiff then received another email from Gary from notifications@clixsign.com that contained the contract for the debt relief program from Defendants. *See Exhibit C.*

81.     The contract Plaintiff received from Gary revealed that Defendants Kish and Debtpay are the other companies responsible for the calls. *See Exhibit C.*

82.     Plaintiff advised Gary he will review the contract and call Gary back if he wanted to proceed with the program.

83.     Plaintiff did not give Gary his prior express written consent to call back Plaintiff and follow up.

84.     Plaintiff received a follow up call from Gary a few hours later. Plaintiff emailed Gary the next day and advised Gary he is no longer interested. *See Exhibit A.*

85.     Defendants' telemarketers spoofed the caller ID numbers on twelve (12) occasions when calling Plaintiff to a (915) area code to trick Plaintiff into thinking the calls were local.

86.    Table A below summarizes the phone calls Plaintiff received on behalf of Defendants:

Table A

| Number: | Date | Time | Caller ID | Notes |
|---------|------|------|-----------|-------|
| 1 | 08/24/2022 | 11:37 AM | 915-929-9451 | Telemarketer calling from united credit services. |
| 2 | 08/29/2022 | 4:13 PM | 915-929-6969 | Telemarketer calling from united credit services. |
| 3 | 08/30/2022 | 4:39 PM | 915-929-5538 | Telemarketer calling from united credit services. |
| 4 | 09/01/2022 | 12:14 PM | 915-929-2699 | Telemarketer calling from united credit services. |
| 5 | 09/01/2022 | 3:02 PM | 915-929-1505 | Telemarketer calling from united credit services. |
| 6 | 09/02/2022 | 9:26 AM | 915-929-3265 | Telemarketer calling from united credit services. |
| 7 | 09/02/2022 | 3:56 PM | 915-929-8008 | Telemarketer calling from united credit services. |
| 8 | 09/02/2022 | 4:26 PM | 915-929-7885 | Telemarketer calling from united credit services. |
| 9 | 09/07/2022 | 1:57 PM | 915-929-6501 | Telemarketer calling from united credit services. |
| 10 | 09/15/2022 | 4:35 PM | 915-929-8411 | Telemarketer calling from united credit services. |
| 11 | 09/19/2022 | 12:38 PM | 915-929-0020 | Telemarketer calling from united credit services. |
| 12 | 09/20/2022 | 12:21 PM | 915-929-7505 | Telemarketer calling from united credit services. Transferred to Gary. Gary emailed contract. |
| 13 | 09/20/2022 | 4:05 PM | 561-425-7815 | Direct follow up call from Gary. |

87.    Defendants employ outrageous, aggressive, and illegal sales techniques that violate multiple federal laws and state consumer statutes.

88.    Defendants USA, Cordoba, and Kisch's telemarketers and their agents and co-conspirators amassed lists of thousands of potential customers from public records, and data aggregators, and then placed phone calls using an ATDS *en masse* to market their debt relief services.

89.     Defendants have knowledge of and have adopted and maintained TCPA violations as a

sales strategy. Defendants knew full well that their telemarketers are calling and harassing

consumers in an attempt to procure business on behalf of the Defendants. Defendants willfully

accepts these referrals and compensate the telemarketers for their illegal unauthorized phone

calls.

90.     Defendants refuse to take any action to stop or curtail the unlawful sales practices that

violate the TCPA because these practices benefit Defendants financially.

91.     Defendants USA, Cordoba, and Kisch are not registered pursuant to § 302.101 of the

Texas Business & Commerce Code to provide telephone solicitations. The

https://direct.sos.state.tx.us/telephone/telephonesearch.asp website ("Texas Registration

Database") does not contain neither Defendants USA, Cordoba, or Kisch's registration.

92.     Defendants USA, Cordoba, and Kisch's do not qualify for an exemption under § 302.053.

93.     No emergency necessitated none of the alleged phone calls.

94.     Plaintiff sent an internal do-not-call policy request to Defendant USA to email

support@debtusa.com on October 30, 2022, which is an email listed on the website they own

and control https://www.debtusa.com/contact.

95.     Plaintiff sent an internal do-not-call policy request to Defendant Cordoba to email

support@cordobalegal.com on October 29, 2022, which is an email listed on the website they

own and control https://www.cordobalegal.com/#contact.

96.     Plaintiff sent an internal do-not-call policy request to Defendant Kisch to email

karen@kischlawfirm.com on October 29, 2022, which is an email owned and controlled by their

CEO Karen Kisch.

97.     Plaintiff sent an internal do-not-call policy request to Defendant Gateway to email

info@debtpaygateway.com on October 29, 2022, which is an email listed on the website they own and control https://www.debtpaygateway.com/contact-us.

98.     None of the Defendants ever sent Plaintiff their internal do-not-call policy.

99.     Upon information and belief, none of the Defendants did not train their telemarketers/agents who engaged in telemarketing on the existence and use of Defendants internal do not call policy as they failed to recognize Plaintiff's personal cell phone 1527 is registered on the National Do-Not-Call Registry.

100.    Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3)(requiring telemarketers to honor and record DNC requests when made).

101.    Plaintiff was harmed by the calls. Plaintiff was temporarily deprived of legitimate use of his phone because the phone line was tied up during the telemarketing calls and his privacy was improperly invaded. Moreover, these calls injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiff. The calls caused Plaintiff's cell phone battery's depletion, used up cellular data, and prevented Plaintiff from otherwise using his telephone for lawful purposes.

## **VICARIOUS LIABILITY OF ALL DEFENDANTS**

102.    Defendants are vicariously liable for the telemarketing calls that generated the lead on their behalf.

103.    The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

104.    The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations*

*Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13

(1995).

105.    The FCC reiterated that a company on whose behalf a telephone call is made bears the

responsibility for any violations. *In re Rules and Regulations Implementing the Telephone*

*Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf

of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a

third party on another entity's behalf under 47 U.S.C. § 227(b)).

106.    The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post

may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its
> telemarketing activities to unsupervised third parties would
> leave consumers in many cases without an effective remedy for telemarketing
> intrusions. This would particularly be so if the telemarketers were
> judgment proof, unidentifiable, or located outside the United States, as is
> often the case. Even where third-party telemarketers are identifiable,
> solvent, and amenable to judgment limiting liability to the telemarketer
> that physically places the call would make enforcement in many cases
> substantially more expensive and less efficient, since consumers (or law
> enforcement agencies) would be required to sue each marketer separately
> in order to obtain effective relief. As the FTC noted, because sellers may
> have thousands of independent marketers, suing one or a few of them is
> unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted)

(alteration marks and internal quotation marks omitted).

107.    More specifically, *Dish* held that, even in the absence of evidence of a formal contractual

relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the

telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

15

108.    The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

109.    To the contrary, the FCC—armed with extensive data about robocalls and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

110.    Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

111.    Defendants are legally responsible for ensuring that the affiliates that make telemarketing calls on their behalf comply with the TCPA when so doing.

112.    Defendants knowingly and actively accepted business that originated through illegal telemarketing.

113.    Defendants knew (or reasonably should have known) that their telemarketers were violating the TCPA on their behalf but failed to take effective steps within their power to force the telemarketer to cease that conduct.

114.    By hiring a company to make calls on its behalf, Defendants "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

115.    Moreover, Defendants maintained interim control over the actions of its telemarketers.

116.    For example, Defendants had absolute control over whether, and under what circumstances, they would accept a customer from its telemarketers.

117.    Furthermore, Defendants had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS to contact potential customers of Defendants and the ability to require them to respect the National Do Not Call Registry.

118.    Defendants also gave interim instructions to its telemarketers by providing lead-qualifying instructions and lead volume limits.

119.    Defendants donned its telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers pitched Defendants debt relief services in the abstract.

120.    Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

121.    "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

122.    A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

123.    Defendants' telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendants. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

124.    Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.*

at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the

telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a

reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's

authorized agent." *Id.* at 6593 ¶ 46.

125.    Defendants are the liable parties as the direct beneficiary of the illegal telemarketing calls

as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for debt relief

services on behalf of Defendants.

### THE TEXAS BUSINESS AND COMMERCE CODE 305.053

126.    The Texas Business and Commerce code has an analogous portion that is related to the

TCPA and was violated in this case.

127.    The Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or

subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

### VIOLATIONS OF THE TEXAS BUSINESS AND COMMERCE CODE § 302.101

128.    The actions of the Defendants violated the Texas Business and Commerce Code 302.101

by placing solicitation phone calls to a Texas resident without having registration certificate and

bond on file with the Texas Secretary of State.

129.    Texas Business and Commerce Code § 302.101 provides a private right of action.  A

violation of Chapter 302 "is a false, misleading, or deceptive act or practice under Subchapter E,

Chapter 17" and is enforceable as such: "A public or private right or remedy prescribed by

Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code §

302.303.

130.    The use or employment by any person of a false, misleading, or deceptive act or practice"

causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50.

131.    Texas Business and Commerce Code §302.101 states that a person (1) "may not make a telephone solicitation" (a) "from a location in [Texas]" or (b) "to a purchaser located in [Texas]," (2) "unless the [person] holds a registration certificate for the business location from which the telephone solicitation is made." Tex. Bus. & Com. Code § 302.101(a).

132.    Under Texas Business and Commerce Code § 302.302 Plaintiff is entitled to seek damages of up to $5000 per violation of §302.101.

## INJURY, HARM, DAMAGES, AND ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

133.    Plaintiff has been denied the use of his phone, enjoyment of his phone, and had the functionality of his phone decreased because of unnecessary charging, erosion of phone memory, and had his privacy invaded by the harassing telemarketing calls.

134.    Defendants' calls harmed the Plaintiff by causing the very harm that Congress sought to prevent a "nuisance and invasion of privacy."

135.    Plaintiff has been annoyed, harassed, and irritated by unauthorized calls placed by and/or on behalf of Defendants.

136.    Defendants' calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone by placing unwanted telemarketing calls to the Plaintiff.

## THE PLAINFF'S CELL PHONE IS A RESIDENTIAL NUMBER

137.    The calls were to the Plaintiff's cellular phone (XXX) XXX-1527, which is the Plaintiff's personal cell phone that he uses for personal, family, and household use. The Plaintiff maintains no landline phones at his residence and has not done so for at least 10 years and primarily relies on cellular phones to communicate with friends and family. The Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending

and receiving text messages. The Plaintiff further has his cell phone registered in his personal name, and pays the cell phone from his personal accounts.

## CAUSES OF ACTION:

### COUNT ONE:
### Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing Without Prior Express Written Consent

138.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

139.    Defendants and/or their affiliates or telemarketers violated the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), at least twelve (12) times by placing non-emergency telemarketing calls to Plaintiff's cellular telephone number using an automatic telephone dialing system without his prior express written consent.

140.    Plaintiff was statutorily damaged at least twelve (12) times under 47 U.S.C. § 227(b)(3)(B) by Defendants by the telephone calls described above, in the amount of $500.00 per call.

141.    Plaintiff was further statutorily damaged because Defendants willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing violation.

142.    Plaintiff is also entitled to and does seek an injunction prohibiting Defendants and their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-emergency telemarketing calls to any cellular telephone number using an ATDS and/or without prior express written consent.

## COUNT TWO:
### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

143.   Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

144.   Defendants telemarketers/agents called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

145.   Plaintiff was statutorily damaged at least thirteen (13) times under 47 U.S.C. § 227(c)(3)(F) by Defendants by the telemarketing calls described above, in the amount of $500.00 per call.

146.   Plaintiff was further statutorily damaged because Defendants willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

147.   Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT THREE:
### Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)

148.   Plaintiff incorporates the forgoing allegations as if fully set forth herein.

149.   The foregoing acts and omissions of Defendants and/or their telemarketers constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

a.  A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[2];

b.  Training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[3]; and,

c.  In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

150.  Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

151.  Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

## COUNT FOUR

### (Violations of The Texas Business and Commerce Code 305.053)

152.  Plaintiff incorporates the foregoing allegations as if set forth herein.

153.  The foregoing acts and omissions of Defendants and/or their telemarketers or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing calls to Plaintiff's cellular telephone number without his prior express written consent in violation of 47 U.S.C. § 227 et seq. The Defendants violated 47 U.S.C. § 227(d) and 47 U.S.C. § 227(d)(3) and 47 U.S.C. § 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[4] *See id.* at 425 (codifying a June 26, 2003 FCC order

154.    Plaintiff seeks for himself an award of at least $500.00 in damages for each such

violation. **Texas Business and Commerce Code 305.053(b).**

155.    Plaintiff seeks for himself an award of up to $1,500.00 in damages for each such knowing

or willful violation. **Texas Business and Commerce Code 305.053**(c).

## COUNT FIVE

### (Violations of Texas Business and Commerce Code 302.101)
### Failure to obtain a Telephone Solicitation Registration Certificate

156.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

122.    Defendants telemarketers/agents made at least thirteen (13) solicitation sales calls to

Plaintiff without having a valid telephone solicitation as required under Tex. Bus. Com. Code

302.101.

123.    As a result of Defendants telemarketers/agents' violations of Tex. Bus. and Com. Code

302.101 Plaintiff may seek damages of up to $5,000 for each violation.  Tex. Bus. and Com.

Code 302.302(a).

124.    As a result of Defendants' agents' violations of Tex. Bus. and Com. Code 302.101

Plaintiff may seek all reasonable costs of prosecuting this action, including court costs,

deposition costs, and witness fees.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Erik Salaiz prays for judgment against the Defendants jointly

and severally as follows:

A.      Leave to amend this Complaint to name additional DOESs as they are identified

and to conform to the evidence presented at trial;

B.      A declaration that actions complained of herein by Defendants violates the TCPA and Texas state law;

C.      An injunction enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.      An award of $1500 per call in statutory damages arising from the TCPA §227(b) intentional violations jointly and severally against the corporations for twelve calls.

E.      An award of $1500 per call in statutory damages arising from the TCPA §227(c) intentional violations jointly and severally against the corporations for thirteen calls.

F.      An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053

G.      An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101.

H.      An award to Mr. Salaiz of damages, as allowed by law under the TCPA;

I.      An award to Mr. Salaiz of interest, costs, and attorneys' fees, as allowed by law and equity

J.      Such further relief as the Court deems necessary, just, and proper.

November 4, 2022,                         Respectfully submitted,


                                          Erik Salaiz
                                          Plaintiff, Pro Se
                                          319 Valley Fair Way
                                          El Paso, Texas 79907
                                          915-929-1527
                                          Salaiz.ep@gmail.com

Gmail - Credit Report

 **Gmail**

**Erik Salaiz <salaiz.ep@gmail.com>**

## Credit Report

3 messages

---

**Gary Williams** <gary.williams@theenrollment.com>
To: salaiz.ep@gmail.com

Tue, Sep 20, 2022 at 12:47 PM

📄 **Eric Salaiz - 26138449.pdf.pdf**
69K

---

**Erik Salaiz** <salaiz.ep@gmail.com>
To: gary.williams@theenrollment.com

Wed, Sep 21, 2022 at 11:11 AM

Gary good morning I'm no longer interested in the program. Thank you

Erik

On Tue, Sep 20, 2022 at 12:43 PM Gary Williams <gary.williams@theenrollment.com> wrote:

---

**Gary Williams** <gary.williams@theenrollment.com>
To: Erik Salaiz <salaiz.ep@gmail.com>

Wed, Sep 21, 2022 at 1:13 PM

Ok, thanks for letting me know.
[Quoted text hidden]

Exhibit A



**formerly Universal Credit**

370 REED ROAD SUITE 100, BROOMALL, PA 19008      <u>Add Product</u>
Phone:   610-284-1000
Fax:      610-284-1500     **INFILE CREDIT REPORT**

| | | | | | |
|---|---|---|---|---|---|
| **FILE #** | 26138449 **FNMA #** | **DATE COMPLETED** | 8/8/2022 | **RQD' BY** | DANIEL MEELER |
| **SEND TO** | DEBTUSA, LLC | **DATE ORDERED** | 8/8/2022 | | |
| | CUST. # PAE30158 | **REPOSITORIES** | EF* | **PRPD' BY** | |
| | 433 PLAZA REAL STE 375 | **PRICE** | $2.35 | **LOAN TYPE** | |
| | BOCA RATON, FL 33432 | **REF. #** | | | |
| **PROPERTY ADDRESS** | | | | | |

| | APPLICANT | | CO-APPLICANT | | |
|---|---|---|---|---|---|
| **APPLICANT** | SALAIZ, ERIC | | **CO-APPLICANT** | | |
| **SOC SEC #** | 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 **DOB** 12/21/1986 | | **SOC SEC #** | | **DOB** |
| **MARITAL STATUS** | NOT DISCLOSED | | **DEPENDENTS** | | |
| **CURRENT ADDRESS** | 319 VALLEY FAIRWAY, EL PASO, TX 79907 | | | **LENGTH** | |
| **PREVIOUS ADDRESS** | | | | **LENGTH** | |

Exhibit A

**DEBTUSA, LLC**
433 PLAZA REAL STE 375
BOCA RATON, FL 33432
8005280097

REPORT #: 26138449

RETURN SERVICE REQUESTED

ERIC SALAIZ
319 VALLEY FAIRWAY
EL PASO, TX 79907

**Your Credit Score and the Price You Pay for Credit**

| Your Credit Score | |
|---|---|
| **Your credit score** | Source: EQUIFAX | Model: EQUIFAX/FICO CLASSIC V5<br>Date: 08/08/22 |

| Understanding Your Credit Score | |
|---|---|
| **What you should know about credit scores** | Your credit score is a number that reflects the information in your credit report.<br><br>Your credit report is a record of your credit history. It includes information about whether you pay your bills on time and how much you owe to creditors.<br><br>Your credit score can change, depending on how your credit history changes. |
| **How we use your credit score** | Your credit score can affect whether you can get a loan and how much you will have to pay for that loan. |
| **The range of scores** | Scores range from a low of 334 to a high of 818.<br><br>Generally, the higher your score, the more likely you are to be offered better credit terms. |
| **How your score compares to the scores of other consumers** | Your credit score ranks higher than 34 percent of U.S. consumers. |
| **Key factors that adversely affected your credit score** | • AMOUNT OWED ON REVOLVING ACCOUNTS IS TOO HIGH<br>• PROPORTION OF BALANCES TO CREDIT LIMITS IS TOO HIGH ON BANK REVOLVING OR OTHER REVOLVING ACCOUNTS<br>• TIME SINCE MOST RECENT ACCOUNT OPENING IS TOO SHORT<br>• TOO MANY CONSUMER FINANCE COMPANY ACCOUNTS |

| Checking Your Credit Report | |
|---|---|
| **What if there are mistakes in your credit report?** | You have a right to dispute any inaccurate information in your credit report. If you find mistakes on your credit report, contact the consumer reporting agency.<br><br>It is a good idea to check your credit report to make sure the information it contains is accurate. |
| **How can you obtain a copy of your credit report?** | Under federal law, you have the right to obtain a free copy of your credit report from each of the nationwide consumer reporting agencies once a year.<br><br>To order your free annual credit report:<br><br>*By telephone:* Call toll-free: 1-877-322-8228<br>*On the web:* Visit www.annualcreditreport.com<br>*By mail:* Mail your completed Annual Credit Report Request Form (which you can obtain from the Federal Trade Commission's web site at http://www.ftc.gov/bcp/conline/include/requestformfinal.pdf) to:<br><br>Annual Credit Report Request Service<br>P.O. Box 105281<br>Atlanta, GA 30348-5281 |
| **How can you get more information?** | For more information about credit reports and your rights under Federal law, visit the Consumer Financial Protection Bureau's web site at www.consumerfinance.gov/learnmore. |

**Exhibit A**

Screenshot_20221030-174359_Messages.jpg

5:43

95%

< +1 561-425-7815 ⌄ ⋮

Tuesday, September 20

https://www.cordobalegal.com/   12:47 PM

**Exhibit B**

Gmail - Eric, Your contract is ready for signature!

 **Gmail**

**Erik Salaiz <salaiz.ep@gmail.com>**

---

## Eric, Your contract is ready for signature!
---

**Enrollment via Clixsign** <notifications@clixsign.com>
Reply-To: notifications@clixsign.com
To: Eric Salaiz <salaiz.ep@gmail.com>

Tue, Sep 20, 2022 at 1:06 PM



NOTIFICATION • SEPTEMBER 20, 2022



# Hi Eric Salaiz
## Your Electronic Signature Is Requested

You are signer 1 of 1 on this document

September 20, 2022

Hello Eric Salaiz,

I'm so happy that we are one step closer to getting you **DEBT FREE!** All that is neec
you to review and sign the attached contract.

Please discuss any questions you might have in reviewing your contract. The contr
require a lot of signatures but this is for your protection.

Exhibit C

# Cordoba Legal Group, LLC.

102 NE 2nd Street #252
Boca Raton, FL 33432

September 20, 2022

## Retainer Agreement

**1.** **Parties:** This Agreement is entered between Cordoba Legal Group, LLC. ("CLG") and Eric Salaiz (individually and collectively, "Client", "your" and/or "your").

**2.** **Scope of CLG's Representation of Client:** CLG will: (A) negotiate Client's debts which are listed on Exhibit A to this Agreement ("Client('s) Debts"), (B) provide Client with legal counsel as to all Client Debts, and (C) represent and defend Client in court in any lawsuits, arbitrations or other proceedings filed against Client by any and all creditors and/or third parties that own and/or have the right to file suit to collect the Client's Debts, subject to the limitations listed below. The terms and scope of CLG's representation of Client are more fully described in paragraph 7 below.

**3.** **Client Obligations, Authorizations and Assistance:**

A.     Client will, at the earliest possible date, provide CLG the most recent billing statement received by Client for each debt listed on Exhibit A. Exhibit A to this Agreement identifies, for all of Client's Debts, the respective creditor and amount owed to each creditor. CLG shall review and, as necessary, update Exhibit A to reflect the amount due each creditor as of the time this Agreement is fully executed. CLG will promptly provide Client with the updated Exhibit A, which shall supersede the Exhibit A originally attached to this Agreement at the time of execution of the Agreement and shall be incorporated with and become a part of this Agreement. Exhibit A is the full and complete list of all debts for which CLG shall provide Client with legal representation as set forth in this Agreement.

If Client does not have the current statement for a creditor(s), CLG will request the statement from the creditor(s), and the balance shown on such statement shall be incorporated in Exhibit A. If Client disputes the balance on such statement and remains unable to obtain another copy of the statement, Client may direct CLG to not represent CLG in connection with the creditor(s) at issue.

**Exhibit C**

F.    In the event of any monies owed to CLG or any attorney or entity providing services for Client's benefit, Client authorizes CLG to remove monies held in their Debt Pay Gateway Savings Account to pay such monies owed.

**4.    Payments:** Client agrees to deposit in their Debt Pay Gateway Savings Account the following amounts.

A.    Initial payment of $303.04 on October 17, 2022.

B.    Recurring Monthly payment of $303.04 commencing on November 15, 2022, for a total of 34 payments.

Client may, but is not required, to make any or all of the payment listed above in advance of their due dates.

D.    In the event that this Agreement is cancelled or terminated by CLG or Client for any reason prior to the date the last payment is due pursuant to this paragraph 4, Client's obligation to make further payments shall cease as of the date of cancellation or termination.

**5.    Division of Payments;
      Client's Settlement Payment Fund, Attorney's Fees and Costs:**

A.    Client understands and acknowledges that the Division of Payments described above will result in a total payment by client of (i) $4,870.80 for the Client's Settlement Payment Fund and (ii) $3,044.25 for CLG's attorney's fees, for a total of $7,915.05. Client acknowledges that CLG will not incur any fees until after a settlement has been initiated. CLG does not charge any advance fees.

B.    If CLG incurs any fees charged by clerks of courts for filing motions, pleadings or other papers on behalf of Client, or for deposition or hearing transcripts, in connection with any litigation matter ("Costs"), CLG will deduct such Bank Fees and Costs from Client's Settlement Payment Fund.

C.    It is understood that Client remains fully responsible for all court costs and other out-of-pocket expenses incurred by CLG in the investigation and defense of any claim. Costs shall include, but not be limited to, expenditures for filing fees, subpoenas, depositions, witness fees, investigation, expert witnesses, reports, travel, parking, and all costs necessary for proper performance of legal services. Client is solely responsible for the payment of all Bank Fees and Costs, none of which are included in the payments due by Client to CLG for attorney's fees or for Client's Settlement Payment Fund. All Bank Fees and Costs, as described paragraph 5(C) herein, incurred in connection with CLG's representation of Client are in addition to any amounts due under paragraph 4 of this Agreement.

**Exhibit C**

14.    **READ BEFORE SIGNING:** YOUR SIGNATURE ON THIS AGREEMENT, AND YOUR INITIALS ON THIS AGREEMENT, MEAN THAT YOU HAVE READ AND UNDERSTAND ALL OF THIS AGREEMENT, AND THAT YOU AGREE TO BE BOUND BY THE AGREEMENT. IF ANY REPRESENTATIVE OF CLG HAS TOLD YOU ANYTHING INCONSISTENT WITH THIS AGREEMENT, DO NOT SIGN THIS AGREEMENT. INSTEAD, CALL CLG AND ASK TO SPEAK WITH ALFREDO CORDOBA, ESQ.

**I AFFIRM THAT I HAVE READ, UNDERSTAND AND AGREE TO ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT.**

Client Name:    Eric Salaiz _____

Client Signature:    _____

Date:    _____

Co-Client Name:    _____

Co-Client Name:    _____

Co-Client Signature:    _____

Date:    _____

**Cordoba Legal Group, LLC**

_____
Alfredo Cordoba

_____
Kisch Consumer Law, PLLC

Exhibit C

# Account Agreement
04.01.0122



## Client Information Sheet

The individual(s) identified as "Client" or "Co-Client" below (**"You(r)"**, **"Client"** or **"Co-Client"**) and executing this Account Agreement (the **"Account Agreement"**), which includes this Client Information Sheet form and the Additional Terms of Service attached hereto, agrees to be bound by the terms and conditions set forth herein. Debt Pay Gateway, Inc. (**"DPG"**) provides transaction management and accounting services (the **"Services"**) through a proprietary software platform (the "Platform"), and upon Your submission of this executed Account Agreement, an account (the **"Account"**) will be established for the purpose of implementing a written debt settlement program (the **"Program"**) that You have approved with a third-party Debt Relief Service Provider (**"DRSP"**) that You have retained for that purpose. DPG does not perform any role in developing, and shall not provide You with any advice concerning, the Program You have approved with Your DRSP. Other than the DRSP's use of the Platform, DPG does not have any ownership interest, affiliation, or other financial arrangement with the DRSP.

### Client Information

| Last Name | First Name | Middle Initial | SSN | DOB |
|---|---|---|---|---|
| Salaiz | Eric | | XXX-XX-0057 | 12/21/1986 |

| Address | | City | State | Zipcode |
|---|---|---|---|---|
| 319 Valley Fairway | | El Paso | TX | 79907 |

| Phone | Email Address |
|---|---|
| 915-929-1527 | salaiz.ep@gmail.com |

**Account ID**
DUSA-614581090

### Co-Client Information

| Last Name | First Name | Middle Initial | SSN | DOB |
|---|---|---|---|---|
| | | | | |

You hereby authorize DPG to: (1) open an Account for You, which shall be utilized to hold funds that You deposit; and (2) disburse those funds to: (a) make payments as set forth in Your Program or as directed by Your DRSP; (b) pay the fees in connection with the Services as set forth herein (the **"Service Fees"**); and (c) to pay any fees or expenses to Your DRSP pursuant to Your Program (the **"Program Fees"**). You hereby designate the DRSP as Your agent for purposes of authorizing those payments, disbursements, and deposits in accordance with Your Program, and agree that DPG may act upon any instruction from your DRSP as if it had come directly from You.

You further authorize DPG to initiate automated clearing house debit transfers/entries from Your designated bank account (the **"Primary Account"**) pursuant to Your Program or the instruction of the DRSP. This authorization is to remain in full force and effect until You have provided DPG with a written or oral notification of Your termination of this Account Agreement no less than three (3) business days in advance of the requested termination date.

Initials

# Exhibit C

ID: 7170752 Signed: 1969-12-31T18:00:00-06:00